### PRESTON v. FINLEY, Comptroller.

#### (Circuit Court, W. D. Texas. March 9, 1896.)

1. EQUITY PLEADING—DEMURRER AND PLEA—CERTIFICATE AND AFFIDAVIT.
   Demurrers which are unsupported either by certificate of counsel or affidavit of the party, as required by equity rule 31, must be disregarded, but they may be considered as grounds of objection to granting a preliminary injunction prayed for.

2. CONSTITUTIONAL LAW—LIBERTY OF THE PRESS—TAXING SALE OF NEWSPAPERS.
   The act of the Twenty-Fourth legislature of Texas which provides for levying a tax on the occupation of selling the Sunday Sun, the Kansas City Sunday Sun, or other publications of like character, is not in contravention of article 1, § 8, of the state constitution, relating to the liberty of the press, or of article 8, § 2, relating to uniformity of taxation. Thompson v. State, 17 Tex. App. 253, and Baldwin v. State, 3 S. W. 109, 21 Tex. App. 591, followed.

3. SAME—TITLES OF LAWS.
   The subject of the said act is sufficiently expressed in its title, within the requirement of article 3, § 35, of the state constitution.

4. SAME.
   The provision of article 1, § 10, cl. 2, of the constitution of the United States, that no state shall, without consent of congress, lay any imposts or duties on imports, etc., does not apply to articles brought into the state from a sister state. Woodruff v. Parham, 8 Wall. 136, followed.

5. SAME—INTERSTATE COMMERCE—NEWSPAPERS.
   Newspapers are subjects of commerce, within the meaning of the provision in the constitution of the United States relating to commerce between the states.

6. SAME.
   The Texas statute imposing an occupation tax of $500 upon every person, firm, or association engaged in selling the Sunday Sun, the Kansas City Sunday Sun, or other publications of like character, being applicable to all persons, whether residents of the state or not, engaged in selling "publications of like character" with those specifically mentioned, is not a discrimination either against the person or the property of the owners of the publications named, and is therefore not invalid as a regulation of interstate commerce.

This bill, duly sworn to by H. L. Strohm, Esq., one of the attorneys of complainant, was brought by Henry L. Preston, a citizen of the state of Missouri, against the comptroller of public accounts of this

state, to restrain the collection of an occupation tax. The question now before the court arises upon a motion made by the complainant for a temporary injunction. The allegations of the bill, material to be considered, are the following:

"Your orator, Henry L. Preston, is now, and for more than five years last past has been, engaged in the newspaper business at Kansas City, Missouri, as editor and publisher of the Kansas City Sunday Sun, a weekly newspaper wholly prepared, edited, and published at Kansas City, in the state of Missouri. That the said newspaper, the Kansas City Sunday Sun, has been duly entered by the post-office department for transmission through the United States mails as second-class matter, and is so transported by the United States government from the state of Missouri into and through the various states of the United States, including the state of Texas. That each separate copy of said newspaper, before being mailed from the state of Missouri, is separately folded, and constitutes a separate, original, and complete package in itself, and is so delivered and sold by your orator through his various agents in the state of Texas. That the monthly shipments of your orator's said newspaper from the state of Missouri into the state of Texas exceed fifty thousand copies, of a total value of over two thousand five hundred dollars. That said shipments are made by your said orator to one or more persons in each of the several counties of the state of Texas, who are the duly employed and authorized agents for your said orator, and, as such, distribute and sell your orator's said newspaper to the numerous patrons within the state of Texas. Your orator further says that the defendant R. W. Finley, in his official capacity as comptroller of public accounts of the state of Texas, has notified each tax collector throughout the state of Texas that there is a special occupation tax of five hundred dollars per annum, in each county, to be levied upon every person, firm, or association of persons selling or offering for sale the Kansas City Sunday Sun, and that he is about to transmit to each tax collector of the state of Texas receipts executed by him for the immediate collection of said alleged occupation tax, in accordance with article 4668c, Sayles' Civ. St. Tex., and that he threatens and is about to enforce and compel the collection of said tax against each of the agents of your orator; that said threatened act of said defendant, if performed or attempted to be performed, will occasion a multiplicity of suits throughout the state of Texas, and will do your orator an irreparable injury, for which he has no sufficient or adequate remedy at law. Your orator further says that the threatened act of the defendant herein complained of is founded upon an act of the Twenty-Fourth legislature of the state of Texas, entitled 'An act to provide for levying a tax on the occupation of selling or offering for sale the Sunday Sun, the Kansas City Sunday Sun, or other publications of like character, whether illustrated or not,' and is in the words and figures following, to wit:

" 'Section 1. Be it enacted by the legislature of the state of Texas. There shall be levied on and collected from every person, firm or association of persons selling or offering for sale, the "Sunday Sun," the "Kansas City Sunday Sun," or other publications of like character, whether illustrated or not, the sum of five hundred dollars in each county in which sale may be made or offered to be made.

" 'Sec. 2. The near approach of the close of the present session of the legislature and the large number of bills now pending on the calendar, and the fact that the occupation herein taxed is not now taxed by law, creates an emergency and a public necessity exists that the constitutional rule requiring bills to be read on three several days be suspended, and that this act take effect and be in force from and after its passage, and it is so enacted.' "

The bill then alleges that the act of the legislature is unconstitutional and void, and states at length the reasons therefor, which may be summarized as follows:

First. Because it is in violation of section 8, art. 1, of the state constitution, in that it curtails the liberty of the press. Second. The act amounts in fact

to an attempt at an unauthorized police regulation, and creates a prohibitory tax upon complainant's newspaper, and is not a bona fide tax for any purpose. Third. Because the subject of the act is not expressed in its title, and the act is therefore repugnant to section 35, art. 3, of the state constitution. Fourth. Because it is in violation of clause 3, § 8, art. 1, of the constitution of the United States, in that it attempts to regulate commerce among the several states. Fifth. It conflicts with clause 2, § 10, art. 1, of the constitution of the United States, in that it lays an impost or duty on imports without the consent of congress. Sixth. Because the act of the legislature is so indefinitely and unintelligibly framed, and of such doubtful construction, that it cannot be properly understood what character of publication it is intended to tax, or what particular class of persons it is designed to effect, etc. Seventh. Because it is special legislation, and it is calculated to affect only the newspaper of complainant, and deprive him of the legal use of his property without just cause, and without due process of law.

An injunction is prayed to enjoin the comptroller, his clerks, agents, etc., from doing any act tending to collect, or enforce the collection of, the tax. Attached to the motion are the following exhibits:

"Exhibit A.

"State of Missouri, Jackson County—ss.: Henry L. Preston, the complainant herein, being first duly sworn, on his oath says that he has read the complainant's bill herein filed, and that, of his own knowledge, the allegations therein are true, except as to those stated on information and belief, and those affiant believes to be true. Affiant further says that according to his best information and belief, and so alleges the fact to be, there are 226 organized counties in the state of Texas, a list of the names of which, with the names of each county seat, is hereto attached, and marked 'Exhibit B.' That affiant attaches hereto, and marks 'Exhibit C,' a true copy of the entry of the Kansas City Sunday Sun at the post office at Kansas City, Missouri, to which he has added an affidavit of the postmaster at Kansas City, Missouri, establishing the fact that said certificate is in full force and effect. Affiant further says that Exhibit D, hereto, is a true copy of the Kansas City Sunday Sun of a date prior to the passage of chapter 50 of the Acts of the 24th legislature, and that Exhibit E, hereto attached, is a true copy of the Kansas City Sunday Sun of a date subsequent to the passage of said act. Further, affiant saith not.

"Henry L. Preston.

"Subscribed and sworn to before me by said Henry L. Preston this Nov. 20th, 1895. My commission expires April 13th, 1899.

"[Seal.]                                                 Ida E. Snow,
                    "Notary Public for Jackson County, Missouri."

"Exhibit C.

"State of Missouri, County of Jackson—ss.: Homer Reed, being duly sworn, says that he is the postmaster of Kansas City, Missouri; that the Kansas City Sunday Sun is a newspaper published at Kansas City, Missouri, and is regularly admitted for transmission through the United States mails as second-class mail matter; and that the certificate, a copy of which is hereto attached, is in full force and effect.                                    Homer Reed,
                    "Postmaster Kansas City, Missouri.

"Subscribed and sworn to before me by said affiant this 20th day of November, 1895.                                    Ida E. Snow, Notary Public.
"My commission expires April 13th, '99. [Seal.]

"(3249)

"Certificate of Entry of Publication as Second-Class Matter.

"Post Office of Kansas City, Mo., Sept. 17th, 1894.

"I hereby certify that the Kansas City Sunday Sun, a weekly newspaper published at this place, has been determined by the third assistant postmaster general to be a publication entitled to admission in the mails at the pound rate

of postage, and entry of it as such is accordingly made upon the books of this office. Valid while the character of the publication remains unchanged.

"Homer Reed, Postmaster,
"By Chas. N. Seidlitz, Asst. P. M."

Attached as exhibits to the bill are also several copies of complainant's newspaper, the Kansas City Sunday Sun.

The attorney general, appearing in behalf of the comptroller, interposes demurrers setting forth the following objections to the bill:

"First. That the complainant hath not in said bill made or stated such a cause as doth or ought to entitle him to any such relief as is thereby sought and prayed for against this defendant. Second. If the statute of the state imposing an occupation tax on the business of selling the Kansas City Sunday Sun is void, the courts of law afford complainant an adequate and complete remedy. Third. That complainant's bill fails to show that the Kansas City Sunday Sun is such a newspaper as, under the laws of this state and of the United States, can be circulated through the mails, or the circulation of which in this state could not be prevented by this state, in a reasonable exercise of its police powers. Fourth. The complainant's bill does not show that this defendant has any authority to prosecute or force the collection of any of the occupation tax alleged to be due; but, on the contrary, said bill doth show that this defendant has no legal duty to perform in connection therewith, except to furnish the tax collectors of the several counties of this state the receipts which they are authorized to issue to those paying said tax, and that upon furnishing said receipts to the tax collectors the legal duty and liability of this defendant are at an end, except in so far as may be necessary to settle with the said tax collectors for such money as they may receive. Fifth. That it appears by said complainant's bill that there are divers other persons, necessary parties to said bill, but who are not made parties thereto; that is to say, it appears that all the tax collectors of the state of Texas, or at least some one or more of them, should be made parties thereto, so that they may be enjoined from attempting to collect said tax, and from prosecuting complainant by reason of his failure to pay the same."

Harry L. Strohm and Boykin & Bashaw, for complainant.
M. M. Crane, Atty. Gen. of Texas, for defendant.

MAXEY, District Judge, after stating the case, delivered the following opinion:

The objection is made in limine by counsel for complainant, to the demurrers of defendant, that they are not supported by the usual certificate of counsel and affidavit of defendant, as required by equity rule 31, which provides that:

"No demurrer or plea shall be allowed to be filed to any bill, unless upon a certificate of counsel that in his opinion it is well founded in point of law, and supported by the affidavit of the defendant that it is not interposed for delay; and if a plea, that it is true in point of fact."

Neither the certificate nor affidavit required by the rule is appended to the demurrers, and they should therefore be disregarded. Construing the rule above quoted, it is said by the supreme court that:

"Inasmuch as the so-called demurrer was fatally defective, in lacking the affidavit of defendant and certificate of counsel required by rule 31, there was no error in disregarding it and entering a decree pro confesso." Furnace Co. v. Witherow, 149 U. S. 576, 13 Sup. Ct. 936; National Bank v. Insurance Co., 104 U. S. 76.

Although the demurrers, as such, cannot be regarded, no reason is perceived why they may not be considered as grounds of objection to granting the preliminary injunction prayed by the bill.

The bill in the present case seeks to enjoin the collection of an occupation tax imposed by the state, upon the two general grounds that the act of the legislature is in violation of the state constitution, and that it is repugnant to the constitution of the United States; and, as a further ground of equitable cognizance, it is insisted that the enforcement of the statute by the collection of the tax would subject complainant to a multiplicity of suits, and result in irreparable injury. That an injunction should issue, in a proper case, to restrain the collection of a tax, is doubtless true. To authorize it, however, the tax must not only be illegal, but the party must, by his bill, bring his case under some acknowledged head of equity jurisdiction, "such as that the enforcement of the tax would lead to a multiplicity of suits or produce irreparable injury, or, where the property is real estate, throw a cloud upon the title of complainant." Shelton v. Platt, 139 U. S. 594, 11 Sup. Ct. 646; Railway Co. v. Cheyenne, 113 U. S. 516, 5 Sup. Ct. 601; State Railroad Tax Cases, 92 U. S. 575; Hannewinkle v. Georgetown, 15 Wall. 547; Dows v. Chicago, 11 Wall. 109; Blessing v. Galveston, 42 Tex. 641. It consequently follows that, if the tax be a legal charge,—if it be lawfully exacted pursuant to a constitutional statute,—an injunction should not issue to stay the hand of the state in the collection of its revenue. Is the statute in question obnoxious to the objections urged by counsel for complainant? It is assailed first on the ground that it is in violation of the constitution of the state. Counsel for complainant, after discussing in their brief several objections to the act of the legislature, make the following admission:

"In answer to this the defendant may cite the court to the case of Thompson v. State, 17 Tex. App. 253. It is true that in that case the learned judge who announced the opinion of the court upheld a similar law to the statute in controversy, and later reaffirmed the decision in the case of Baldwin v. State, 21 Tex. App. 591, 3 S. W. 109. In neither of these cases was the construction of article 6 of the Penal Code asked, nor was the claim made that section 8 of the bill of rights was violated."

It must be remembered that this is not a tribunal clothed with power to revise and reverse the decisions of the highest courts of the state upon questions which concern the validity of a state law, as affected by the constitution of the state, and the true construction of that law. Generally speaking, such decisions are binding upon the federal courts, and are to be accepted by them as correct expositions of the law in a given case. Thus, it is said by Mr. Justice Miller, speaking for the court, in State Railroad Tax Cases, supra:

"As the whole matter, then, concerns the validity of a state law, as affected by the constitution of the state, that question, and the other one of the true construction of that statute, belong to the class of questions in regard to which this court still holds, with some few exceptions, that the decisions of the state courts are to be accepted as the rule of decision for the federal courts."

In Machine Co. v. Gage, 100 U. S. 677, it is said by Mr. Justice Swayne, as the organ of the court, that:

"The sewing machines here in question were made in Connecticut. The supreme court of the state held in this case 'that the law taxing the peddlers of such machines levied the tax upon all peddlers of sewing machines, without regard to the place of growth or produce of material or of manufacture.' We are bound to regard this construction as correct, and to give it the same effect as if it were a part of the statute."

And in Pullman's Palace-Car Co. v. Pennsylvania, 141 U. S. 21, 11 Sup. Ct. 876, this emphatic language is employed by Mr. Justice Gray, who rendered the opinion of the court:

"Upon this writ of error, whether this tax was in accordance with the law of Pennsylvania is a question in which the decision of the highest court of the state is conclusive."

In the case at bar the argument of counsel seems to proceed upon the assumptions: (1) That this case involves distinct questions, concerning which no ruling was requested, nor made by the court of appeals, in the Cases of Thompson and Baldwin; and (2) that those cases have been overruled by the same court in Ex parte Neill, 32 Tex. Cr. R. 275, 22 S. W. 923. By reference to the Thompson Case, it will be seen that he was indicted for the offense "of pursuing the occupation or business of selling and offering for sale the Illustrated Police News and Police Gazette without obtaining license and paying occupation tax therefor." The trial resulted in his conviction, and the assessment of a fine of $750.

"The motion in arrest of judgment alleged that the indictment charged no offense; that the act of May 4, 1882, so far as it attempts to levy the tax for the failure to pay which the defendant was indicted, is oppressive, indefinite, and uncertain, and beyond the power of the legislature; the said act is repugnant to section 2, art. 8, of the constitution; that the indictment did not sufficiently and with certainty describe the occupation for the pursuing of which the defendant was sought to be charged; that the prosecution was such as is expressly prohibited by section 8 of article 1 of the constitution."

By the act of May 4, 1882, it is provided that there shall be levied on and collected "from every person, firm or association of persons selling or offering for sale, the Illustrated Police News, Police Gazette, and other illustrated publications of like character, the sum of $500 in each county in which such sale may be made or offered to be made." Judge Willson, in delivering the opinion of the court, says:

"There is but a single question presented by the record for our determination, and that is the constitutionality of the above-quoted statutory provision. Counsel for appellant contends that said law is unconstitutional for two reasons: (1) That the tax levied by it is not 'equal and uniform upon the same class of subjects.' Const. art. 8, §§ 1, 2. (2) That it is oppressive, vague, uncertain, indefinite, and beyond the power of the legislature."

At page 258, 17 Tex. App., Judge Willson further says:

"In support of our view that the law in question is valid, that it was fully within the power of the legislature to enact it, and that it is not obnoxious to any of the objections made to it, we cite the following additional authorities: Cooley, Tax'n, 396, 403, 404; Cooley, Const. Lim. 713, 725, 748, 749; Burroughs, Tax'n, § 77; Languille v. State, 4 Tex. App. 312; Higgins v. Rinker, 47 Tex. 393."

From the record in Thompson's Case, it appears that his counsel, in their motion in arrest of judgment, relied upon the same article of the bill of rights (Const. art. 1, § 8) as do counsel for complainant here; and, while the construction of article 6 of the Penal Code was not directly requested, it may be answered that it was necessarily involved, for if the statute was so vague and indefinitely framed, or of such doubtful construction, that it could not be understood, its invalidity would have been declared by the court if article 6 had no place in the Penal Code.

Counsel for complainant urgently insist that a tax levied upon the occupation of selling a newspaper contravenes section 8, art. 1, of the constitution, because it restricts the liberty of the press. That article is as follows:

"Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press."

It has already been shown that this provision of the constitution was relied upon by counsel in Thompson's Case to defeat a similar statute, which was declared by the court to be in all respects constitutional. And, as the decision of the court of appeals is binding upon this court, it is deemed useless to pursue the argument further, except to add, in the language of Judge Simkins:

"It is obvious, from the express terms of the constitution, that the only exemptions from the all-pervading power of taxation are the agricultural and mechanical pursuits." Ex parte Williams, 31 Tex. Cr. R. 272, 20 S. W. 580; Albrecht v. State, 8 Tex. App. 221; Languille v. State, supra.

The position assumed by counsel for complainant, that article 6 of the Penal Code, and section 8 of the bill of rights, were not substantially given effect by the court in Thompson's Case, does not seem to be well taken. But it is further contended that the Cases of Thompson and Baldwin are overruled by the subsequent case of Ex parte Neill, supra. A brief reference to Ex parte Neill will demonstrate the fallacy of this contention. Neill, a newsdealer in the city of Seguin, was arrested and fined in the mayor's court for violating the following ordinance: The city council of the city of Seguin ordained—"That the Sunday Sun, a paper said to be published at Chicago, Illinois, is hereby declared a public nuisance, and its circulation prohibited within the corporate limits of the city of Seguin. Any person or persons offering to sell, barter, give away, or in any manner dispose of the Sunday Sun in violation of above ordinance, shall be punished in a fine not to exceed one hundred dollars." Resorting to a writ of habeas corpus, Neill was remanded to custody by the county judge, and appealed his case to the court of criminal appeals. The court properly held the ordinance void, and observed: "We are not informed of any authority which sustains the doctrine that a municipal corporation is invested with the power to declare the sale of newspapers a nuisance." The court makes no reference, direct or remote, to the Thompson and Baldwin Cases. Why? Because there is such striking dissimilarity between them and Neill's Case that it was evidently deemed altogether unnecessary to allude to the distinc-

tion. "We take it to be a sound principle," says the supreme court, "that no proposition of law can be said to be overruled by a court, which was not in the mind of the court when the decision was made." Woodruff v. Parham, 8 Wall. 138.

The decisions of the court in Thompson v. State and Baldwin v. State are therefore binding upon this court, in so far as they affect questions already discussed. This further objection is, however, urged by complainant's counsel to the validity of the act in question:

"Because the act is in violation of section 35, art. 3, of the constitution of the state of Texas, in this: that the subject of said act is not expressed in the title. The title expresses only the taxing of a certain occupation, while the act itself taxes each individual, and single sale or offer of sale, whether selling said newspaper be followed as an occupation or not."

As the question involved in this objection did not arise, and could not have arisen, in the Thompson Case, it becomes the duty of the court to consider it. The act complained of, including its title, is set out in the foregoing statement of the case, and need not be repeated. Having under consideration section 35, art. 3, of the constitution, it is said by Judge Clark, in Albrecht v. State, 8 Tex. App. 221, that:

"In construing the provision, therefore, courts have almost uniformly refused to adopt a strict and literal construction, which would inevitably tend to the serious embarrassment of legislation, and have uniformly sustained legislation when the several provisions of the act are fairly indicated in the general object as stated in the title, under a rule adopted by themselves, giving to the sections a broad and liberal construction. The general purpose of the provision is fully accomplished when a law has but one general object, which is fairly indicated by its title; and the generality of the title is not objectionable so long as it is not made a cover to legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection."

In support of the principle, Judge Clark cites Breen v. Railway Co., 44 Tex. 302; Giddings v. City of San Antonio, 47 Tex. 548; Ex parte Mabry, 5 Tex. App. 93; Railroad Co. v. Potts, 7 Ind. 681; People v. Briggs, 50 N. Y. 553; Cooley, Const. Lim. 141–145.

In Day Land & Cattle Co. v. State, 68 Tex. 542, 4 S. W. 865, Mr. Justice Stayton, delivering the opinion of the court, states the purpose of the constitutional provision in the following language:

"As said in Tadlock v. Eccles, 20 Tex. 793, 'the intention, doubtless, was to prevent embracing in an act having one ostensible object provisions having no relevancy to that object, but really designed to effectuate other and wholly different objects, and thus to conceal and disguise the real object proposed by the provisions of an act under a false and deceptive title.' A title or act essentially single in subject, which does not conceal or disguise the real purpose, is not subject to constitutional objection, although the ends intended to be reached through the one subject may be many."

There is no ambiguity in the act in question, nor real inconsistency between it and the title. The act, considered in connection with its title, makes manifest the legislative intent to tax every person who sells or offers for sale the publications named. Tested by the authorities referred to, the law is not obnoxious to the objection urged against it; and, following the decisions of the highest courts of the state, it must be held valid in its entirety,

as a legislative enactment in harmony with the provisions of the state constitution.

Counsel for complainant further challenge the validity of the statute upon the grounds (1) that "it is in violation of clause 3 of section 8 of article 1 of the constitution of the United States, in that it attempts to regulate commerce among the several states"; and (2) "because it is in conflict with clause 2, § 10, art. 1, of the constitution of the United States, in that it lays an impost or . duty on imports without the consent of congress,—said Kansas City Sunday Sun being an article of import from the state of Missouri into the state of Texas, by your orator herein." The intricate, difficult, and serious questions which these objections involve have received at the hands of the court the careful attention and thoughtful consideration which their importance demands. A large number of cases have been examined, beginning with Gibbons v. Ogden (decided in 1824) 9 Wheat. 1, and extending to Emert v. Missouri (decided in 1895) 156 U. S. 296, 15 Sup. Ct. 367. And the embarrassment attending the effort of the trial court to reach correct conclusions in cases involving "the questions of the nature of the power to regulate commerce, and how far that power is exclusively vested in congress," is greatly enhanced when it is reflected that, employing almost the exact language of Mr. Justice Miller, the question has seldom been decided in the supreme, court with unanimity. Hinson v. Lott, 8 Wall. 152. Although 28 years have elapsed since the statement made by that eminent jurist, a continuing "want of unanimity" is clearly made manifest by later decisions; notably, those rendered in Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, and the recent case of Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154. With these observations, the court will proceed to inquire whether the objections of counsel are tenable. The two clauses of the federal constitution invoked to defeat the statute read as follows:

Clause 3, § 8, art. 1: "The congress shall have power * * * to regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

Clause 2, § 10, art. 1: "No state shall, without the consent of the congress, lay any imposts, or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

By the Texas statute, "every person, firm or association of persons selling or offering for sale the 'Sunday Sun' the 'Kansas City Sunday Sun,' or other publications of like- character, whether illustrated or not," is required to pay "the sum of five hundred dollars in each county in which sale may be made or offered to be made." Article 112 of the Penal Code of 1895 provides:

"Any person who shall pursue or follow any occupation, calling or profession, or do any act taxed by law, without first obtaining a license therefor, shall be fined in any sum not less than the amount of the taxes due, and not more than double that sum."

The case made by the bill is that the complainant is a citizen of Missouri; that he is the editor and publisher of the Kansas City Sunday Sun; that his newspaper has been entered by the post-

office department for transmission through the mails as second-class matter, and is so transported by the United States government from the state of Missouri into the state of Texas; that each separate copy of his paper, before being mailed from the state of Missouri, is separately folded, and constitutes a separate, original, and complete package in itself, and is so delivered and sold by him through his various agents in the state of Texas; that the monthly shipments of his paper to the state of Texas exceed 50,000 copies; that said shipments are made by him to one or more persons in each of the several counties of the state, who are his duly-employed and authorized agents, and as such distribute and sell his papers to the numerous patrons thereof within the state. Upon the case thus made the complainant relies to defeat the state statute, as being repugnant to the provisions of the two clauses of the constitution above quoted, "in that it, in effect, regulates commerce among the several states, and, without the consent of congress, lays an impost duty upon the complainant's newspaper." "'Commerce,'" says the supreme court, "is a term of the largest import. It comprehends intercourse for the purposes of trade, in any and all its forms, including the transportation, purchase, sale, and exchange of commodities between the citizens of our country and the citizens or subjects of foreign countries, and between the citizens of different states." Welton v. Missouri, 91 U. S. 280. In County of Mobile v. Kimball, it is said by the supreme court that "commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, including in those terms navigation, and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities." 102 U. S. 702; McCall v. California, 136 U. S. 108, 10 Sup. Ct. 881. "Commerce, undoubtedly, is traffic," said Chief Justice Marshall, "but it is something more. It is intercourse. It describes the commercial intercourse between nations and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." Gibbons v. Ogden, 9 Wheat. 189. Within the comprehensive definition given the term "commerce" by the supreme court, a newspaper is a subject of commercial intercourse and sale between state and state, like any other article in which a right of traffic exists. But is the conclusion warranted that a statute infringes the constitution when it imposes a tax upon every person alike, whether resident or non-resident, who sells within the limits of a state a newspaper published in another state, and other publications of like character? Clause 2, § 10, art. 1, of the constitution is inapplicable to the question now under consideration, as it has been expressly held by the supreme court that the constitutional provision against taxing imports by the state does not extend to articles brought from a sister state. Discussing this clause, Mr. Justice Miller, in Woodruff v. Parham, 8 Wall. 136, 137, says:

"Whether we look, then, to the terms of the clause of the constitution in question, or to its relation to the other parts of that instrument, or to the history of its formation and adoption, or to the comments of the eminent men who took

part in those transactions, we are forced to the conclusion that no intention existed to prohibit, by this clause, the right of one state to tax articles brought into it from another." Hinson v. Lott, supra; Brown v. Houston, 114 U. S. 622, 5 Sup. Ct. 1091.

Is the position of counsel maintainable,—that the statute is in derogation of clause 3, § 8, art. 1, in that it attempts to regulate commerce among the states? In support of this contention, reliance is placed upon Leisy v. Hardin, supra; Bowman v. Railroad Co., 125 U. S. 465, 8 Sup. Ct. 689, 1062; Robbins v. Taxing Dist., 120 U. S. 489, 7 Sup. Ct. 592,—and other authorities cited in the brief. It would prove a fruitless undertaking for the court to attempt a review of the cases, for the purpose of distinguishing between them. That duty has been performed by the supreme court in numerous cases, and particularly in the exhaustive prevailing and dissenting opinions in Leisy v. Hardin, in Plumley v. Massachusetts, and Emert v. Missouri. And it may be remarked that, in Plumley v. Massachusetts, Leisy v. Hardin is expressly limited. 155 U. S. 474, 15 Sup. Ct. 154. Without entering, therefore, upon a more extended reference to the cases, it is thought that the disposition of this case should be controlled by the principles laid down by the court in Woodruff v. Parham, Hinson v. Lott, Machine Co. v. Gage, Brown v. Houston, and Emert v. Missouri. In essential respects, the facts of Woodruff v. Parham are quite similar to those upon which complainant here relies, and may be stated as follows:

"The city of Mobile, Alabama, in accordance with a provision of its charter, authorized the collection of a tax for municipal purposes on real and personal estate, sales at auction, and sales of merchandise, capital employed in business, and income within the city. This ordinance being on the city statute book, Woodruff and others, auctioneers, received in the course of their business, for themselves, or as consignees and agents for others, large amounts of goods and merchandise, the product of states other than Alabama, and sold the same in Mobile, to purchasers, in the original and unbroken packages. Thereupon the tax collector for the city demanded the tax levied by the ordinance."

Woodruff refused to pay, asserting that it was repugnant to the following clauses of the constitution: Clause 3, § 8, art. 1; clause 2, § 10, art. 1; and clause 1, § 2, art. 4. The supreme court of Alabama decided in favor of the tax, and its judgment was affirmed by the supreme court of the United States. In discussing the case the following questions and answers are suggested by the court:

"But we may be asked, is there no limit to the power of the states to tax the produce of their sister states, brought within their borders? And can they so tax them as to drive them out, or altogether prevent their introduction, or their transit over their territory? The case before us is a simple tax on sales of merchandise, imposed alike upon all sales made in Mobile, whether the sales be made by a citizen of Alabama or of another state, and whether the goods sold are the produce of that state, or some other. There is no attempt to discriminate injuriously against the products of other states, or the rights of their citizens; and the case is not, therefore, an attempt to fetter commerce among the states, or to deprive the citizens of other states of any privilege or immunity possessed by citizens of Alabama. But a law having such operation would, in our opinion, be an infringement of the provisions of the constitution which relate to those subjects, and therefore void." 8 Wall. 140.

The question in Hinson v. Lott arose upon the thirteenth section of the Alabama statute, which is in these words:

"Before it shall be lawful for any dealer or dealers in spirituous liquors to offer any such liquors for sale within the limits of this state, such dealer or dealers introducing any such liquors into the state for sale shall first pay the tax-collector of the county into which such liquors are introduced, a tax of fifty cents per gallon upon each and every gallon thereof."

Other sections of the same statute laid a tax of 50 cents per gallon on all whisky and all brandy from fruits manufactured in the state. With this statute in force, Hinson, a Mobile merchant, filed a bill against the tax collector for the city of Mobile and state of Alabama, "in which he set forth that he had on hand five barrels of whisky consigned to him by one Dexter, of the state of Ohio, to be sold on account of the latter in the state of Alabama, and that he had five other barrels purchased by himself in the state of Louisiana, and that he had brandy and wine imported from abroad (upon which he had paid the import duties laid by the United States, at the customhouse at Mobile), all of which liquors he now held, and was offering for sale, in the same packages in which they were imported, and not otherwise." Hinson insisted that the statute was void as being in conflict with the United States constitution, and prayed an injunction. The case went to the supreme court of the state, and "the state tax of fifty cents per gallon on the whisky of Dexter, of Ohio, and that purchased by plaintiff in Louisiana, was held to be valid." Upon writ of error to the United States supreme court the judgment was affirmed, and, after discussing the constitutional question, it is said by the court:

"As the effect of the act is such as we have described, and it institutes no legislation which discriminates against the products of sister states, but merely subjects them to the same rate of taxation which similar articles pay that are manufactured within the state, we do not see in it an attempt to regulate commerce, but an appropriate and legitimate exercise of the taxing power of the states."

In Machine Co. v. Gage the following are the material facts: The Howe Machine Company was a corporation of Connecticut. It manufactured sewing machines at Bridgeport, in that state, and had an agency at Nashville, in the state of Tennessee. From the latter place an agent was sent into Sumner county to sell machines there. A tax was demanded from him for a peddler's license to make such sales. He denied the validity of the law under which the tax was claimed, but, according to a law of the state, paid the amount demanded by Gage as clerk of the county court. The company, who brought the suit to recover it back, was defeated in the lower court. The judgment was sustained by the supreme court of the state, and subsequently affirmed by the supreme court of the United States, in an opinion delivered by Mr. Justice Swayne. After reviewing the cases the justice adds:

"In all cases of this class to which the one before us belongs, it is a test question whether there is any discrimination in favor of the state, or of the citizens of the state, which enacted the law. Wherever there is, such discrimination is fatal." 100 U. S. 679.

In Brown v. Houston a bill in equity was filed to restrain the defendant, Houston, from selling a lot of coal belonging to the plaintiffs for the purpose of collecting a tax imposed upon personal property by the authorities of the state of Louisiana. In addition to the usual averments to be found in similar bills, it was alleged by the plaintiffs—

"That said coal was mined in Pennsylvania, and was exported from said state and imported into the state of Louisiana as their property, and was then [at the time of the petition], and had always remained, in its original condition, and never had been or become mixed or incorporated with other property of the state of Louisiana; that when said assessment was made the said coal was afloat in the Mississippi river, in the parish of Orleans, in the original condition in which it was exported from Pennsylvania, and the agents, Brown & Jones, notified the board of assessors of the parish that the coal did not belong to them, but to the plaintiffs, and was held as before stated, and was not subject to taxation, and protested against the assessment for that purpose."

The plaintiffs prayed an injunction, which was granted. On final hearing the injunction was dissolved and the bill dismissed. The supreme court of Louisiana affirmed the judgment (33 La. Ann. 843), and the ruling was sustained by the supreme court of the United States. It was said by Mr. Justice Bradley, who delivered the opinion of the court, that:

"As to the character and mode of the assessment, little need be added to what has already been said. It was not a tax imposed upon the coal as a foreign product, or as the product of another state than Louisiana, nor a tax imposed by reason of the coal being imported or brought into Louisiana, nor a tax imposed whilst it was in a state of transit through that state to some other place of destination. It was imposed after the coal had arrived at its destination and was put up for sale. The coal had come to its place of rest, for final disposal or use, and was a commodity in the market of New Orleans. It might continue in that condition for a year or two years, or only for a day. It had become a part of the general mass of property in the state, and as such it was taxed for the current year [1880] as all other property in the city of New Orleans was taxed. Under the law it could not be taxed again until the following year. It was subjected to no discrimination in favor of goods which were the product of Louisiana, or goods which were the property of citizens of Louisiana. It was treated in exactly the same manner as such goods were treated. It cannot be seriously contended—at least, in the absence of any congressional legislation to the contrary—that all goods which are the product of other states are to be free from taxation in the state to which they may be carried for use or sale. Take the city of New York, for example. When the assessor of taxes goes his round, must he omit from his list of taxables all goods which have come into the city from the factories of New England and New Jersey, or from the pastures and grain fields of the West? If he must, what will be left for taxation? And how is he to distinguish between those goods which are taxable and those which are not? With the exception of goods imported from foreign countries, still in the original packages, and goods in transit to some other place, why may he not assess all property alike that may be found in the city, being there for the purpose of remaining there till used or sold, and constituting part of the great mass of its commercial capital, provided, always, that the assessment be a general one, and made without discrimination between goods the product of New York, and goods the product of other states? Of course, the assessment should be a general one, and not discriminative between goods of different states." 114 U. S. 632, 633, 5 Sup. Ct. 1091.

Emert v. Missouri involved the construction of a statute of Missouri which required peddlers to obtain a license before selling their

wares, and imposed a penalty for noncompliance with its provisions. An information was filed against Emert for failing to comply with the law. He was adjudged guilty, and sentenced to pay a fine of $50 and costs. The judgment was sustained by the supreme court of Missouri (15 S. W. 81), and the case went by writ of error to the United States supreme court.

"The facts were agreed,—that the Singer Manufacturing Company, for more than five years last past, and on the day in question, was a corporation of New Jersey; that the defendant, on and prior to that day, was in the employment of that company, and on that day, in pursuance of that employment, and having no peddler's license, was engaged in going from place to place in Montgomery county, in the state of Missouri, with a horse and wagon, soliciting orders for the sale of the company's sewing machines, and having with him in the wagon one of those machines, the property of the company, and manufactured by it at its works in New Jersey, and which it had forwarded and delivered to him for sale on its account, and that he offered this machine for sale to various persons at different places, and found a purchaser, and sold and delivered it to him."

After an elaborate review of adjudged cases, embracing those above cited, the court held that:

"The necessary conclusion, upon authority, as well as upon principle, is that the statute of Missouri, now in question, is nowise repugnant to the power of congress to regulate commerce among the several states, but is a valid exercise of the power of the state over persons and business within its borders."

So, also, it must be held in this case that the statute of Texas is not in conflict with the commerce clause of the constitution, but is a valid exercise of the power of the state over persons and business within its territorial limits, unless it discriminates against the person or property of complainant. If the discrimination exists, as in Welton v. Missouri, supra; Walling v. Michigan, 116 U. S. 446, 6 Sup. Ct. 454; Robbins v. Taxing Dist., supra; Asher v. Texas, 128 U. S. 129, 9 Sup. Ct. 1; Brimmer v. Rebman, 138 U. S. 78, 11 Sup. Ct. 213; and others of that class,—then the statute, according to all the decisions, would be repugnant to the constitution and void. It must be borne in mind that the court of appeals of this state held a similar statute as not being in conflict with the state constitution, and that the tax levied thereunder was not discriminative, but equal and uniform in its operation. Employing the precise language of the court:

"This law exempts no publication belonging to the class represented by the two named publications from the tax levied. We conclude, therefore, that the tax levied is equal and uniform; applicable to all publications coming within the class designated." Thompson v. State, 17 Tex. App. 256.

If, then, as said by the supreme court of the United States in reference to the decision of the supreme court of Tennessee, "We are bound to regard this construction as correct, and to give it the same effect as if it were a part of the statute," the conclusion is inevitable that the act in question should be construed as not discriminating either against the person or the property of complainant. The law, indeed, requires the person who sells the complainant's newspaper to pay the tax, but it is equally obligatory on all persons who sell "other publications of like character" to

pay the same amount. Whether, therefore, the seller of the paper be a resident or nonresident of the state; whether the "Kansas City Sunday Sun, or other publication of like character," be edited and published in Missouri, Texas, or elsewhere,—each and all, without distinction or discrimination, must submit to the requirements of the law before selling, within the limits of the state, the designated publications. As thus construed, the act is not obnoxious to the criticisms of counsel, and should be held to be a valid exercise of legislative power, and not an encroachment on the commerce clause of the constitution. The motion for injunction should be denied, and it is so ordered.